WELLS A. BINGHAM, Survivor of the Copartnership .of Craft & Bingham, Appellant, *against* RICHARD C. HARRIS *et al.*, Respondents.

(Decided June 5th, 1882.)

In an action for the price of paper alleged by the plaintiffs to have been sold and delivered by them to the defendants, it appeared that an agreement for the manufacture and delivery of paper, like a certain sample, had been negotiated by one G., on behalf of the plaintiffs, with the defendants, who wanted such paper to supply customers at B., and that the defendants gave to the plaintiffs personally a written order for the paper in accordance with the agreement. Evidence was given on. the part of the defendants that G. subsequently came to them, with a sample of the paper manufactured, which they refused to accept, because not according to sample; that G. then said, in substance, "if you will send it to your customers in B. we will take the risk of their accepting it ;" whereupon the defendants consented to send it, and did send it, to their customers at B., who refused to accept and returned it. On the part of the plaintiffs, G. testified that he made no such agreement in respect to the delivery; and as to his authority to make such an agreement, the plaintiffs and G. himself testified that he was employed by them as a broker to solicit orders, subject to their approval, at a commission upon sales, and had no authority in any transaction without submitting the matter to them, though one of the plaintiffs testified that if G. had no other work to do, he was to make himself generally useful; while the defendants and their witnesses testified that numbers of previous pur-chases of paper had been made by the defendants from the plaintiffs through G. in the same way, bills for which had been collected by G., sometimes before they became due; and that it was generally understood that G. worked for the plaintiffs, and he had been frequently seen in their place of business engaged in the work of a general clerk in the business. The judge instructed the jury that if G. was merely a broker, and plaintiffs did nothing which could lead defendants to suppose that he held any other relation to them, the plaintiffs were entitled to a ver-dict; but that if G. occupied substantially the relation of a clerk to the. plaintiffs, and was held out by them for the uses to which they devoted him, and if the persons dealing with plaintiffs' house had a right to sup-pose that he was their clerk, and if he in fact made the conditional agreement testified to, the defendants were entitled to a verdict, unless the jury should find that the paper was according to sample. The jury found for the defendants. *Held*, that they must be presumed to have found the facts to be as stated in the last proposition submitted to them; that there was sufficient evidence to require the submission to the jury

of the question involved in that proposition, and that, as matter of law, the instruction given was correct.

*Held,* also, that under the circumstances the defendants were entitled to recover, as damages, the amount they had paid for freight, and the profits they would have made by the sale, if the paper had been as ordered.

APPEAL from a judgment of this court entered upon the verdict of a jury, and from an order denying a motion for a new trial.

The facts are stated in the opinion.

*Albert A. Abbott,* for appellant.

*David Crawford,* for respondents.

CHARLES P. DALY, Chief Justice.—The former judgment for the plaintiffs. was reversed by the general term, upon the ground that it involved questions of fact, which it was for the jury and not for the court to pass upon.

In the present trial, the jury were instructed, that if Goodenough was merely a broker, and had no other connection with the plaintiffs than that of soliciting orders, and receiving commissions therefor, and if the plaintiffs did nothing which would lead the defendants to suppose that he held any other relation to them, the plaintiffs were entitled to a verdict; but that, if Goodenough occupied substantially the relation of a clerk to the plaintiffs, and was held out by them for the uses to which they devoted him; and if the persons dealing with the plaintiff's house had a right to suppose that he was their clerk; and if Goodenough came to the defendants with a sample of the paper manufactured; and if Benjamin H. Harris, one of the defendants, said that the sale did not correspond with the sample and that he would not accept it; and if Goodenough said, "If you will send it to your customers in Buffalo, we (the plaintiffs) will take the risk of their accepting it," the defendants were entitled fo a verdict; unless the jury should find that the paper corres-

ponded with the sample which was attached to the order at the time when the order was given. And as the jury gave a verdict for the defendants, we must assume that they found the facts to be as stated in the last proposition submitted to them.

The plaintiff's counsel excepted to the instruction, that if Goodenough was permitted to occupy the position of a clerk, and made the agreement claimed by the defendants, the plaintiffs were responsible for it.

The question therefore is whether there was sufficient evidence in the case, to submit the question involved in the second proposition of the judge to the jury, and whether, as matter of law, the instruction he gave was correct.

The evidence as to the relation between Goodenough and the plaintiffs, or in what capacity he acted for them, was conflicting. The plaintiff Bingham testified that he was employed by their firm, from February to November, 1879, as a broker, to solicit orders for them, and to work up the city trade; that the orders he obtained had to be submitted to them for their approval or disapproval, and that he received a commission upon sales that were made through his efforts; that if the plaintiffs approved the order and the sale was made, that was all he had to do with the transaction; that he was employed soliciting orders from 9 to 10 o'clock in the morning, and from 3 to 4 in the afternoon, and that, when he was not so engaged, he was usually at plaintiff's store; that the plaintiffs never authorized him to close sales on behalf of their firm; that their dealings after the order was accepted were with the parties from whom the order was obtained; that he had no authority to make any such agreement with the defendants as testified to, nor authority in any transaction, large or small, without submitting the matter to them. The other plaintiff, Craft, who is now dead, testified upon the former trial to the same general effect; but in addition, that if he, Goodenough, had no other work to do, he was to make himself generally useful, in respect to which part of Craft's testimony, the plaintiff Bingham testified that Craft was wrong; that he, Bingham made the original arrangement with Goodenough.

Goodenough testified that all that he was employed to do, was to solicit orders, and that whilst he was with the plaintiffs, he did other business for them, but that it was voluntary.

On the part of the defendants, Benjamin H. Harris testified that Goodenough worked for Craft & Bingham in selling paper for them, he could not say how long, but that he dealt with him a number of times; that he knew him to be connected with the plaintiffs for six months before this transaction, and that defendants purchased " some numbers of papers " through him from the plaintiffs' house, and that he collected the bills. But, upon cross-examination, he testified that, of his personal knowledge, he did not know of his collecting more than one bill for the plaintiffs. That in making sales for the plaintiffs to the defendants, he solicited the orders, agreed upon the price, and agreed to make the quality of paper like the sample; and that it was the defendants' course to follow up what Goodenough did, by making out a written order upon the terms arranged with Goodenough, and take it to the plaintiffs.

Hefferman, a paper dealer, testified that it was generally understood, as he believed, that Goodenough worked for Craft & Bingham; that he only knew, however, what Goodenough told him about it; that he never heard anything about it from the plaintiffs; that he had seen Goodenough in their store, more times than he could tell; that he was writing in their books sometimes, sometimes talking to customers, other times sorting samples, and doing various other work, such as the witness often did himself when he was a clerk. And in respect to the qualified acceptance of the paper, on the part of the defendants, a salesman of the defendants—Daniels—testified, that when Goodenough told Benjamin H. Harris, that if he would send the paper to the defendants' customers, and it did not answer, that the plaintiffs would take it back, Mr. Harris asked him whether he had authority to do that, and he said, " whatever I do for Craft & Bingham, I have authority from them to do"—which was a statement on the part of Goodenough in direct conflict with his testimony as a witness on the trial.

Another clerk of the defendants—Conrad—testified that three or four months before this transaction, he noticed Goodenough coming to the defendants' store, trying to get orders for the plaintiffs, and to collect money for them, sometime before it was due.

The defendants' book-keeper—Lyon—testified that he saw Goodenough coming to the defendants' store a number of times to solicit orders and collect bills for the plaintiffs; that he had seen him probably two or three months before that transaction, and saw him collect two or three bills; two, certainly.

The question in this case was not what the understanding or agreement between Goodenough and the plaintiffs was, but what the defendants were entitled, as business men, to assume in respect to Goodenough's authority in making sales in behalf of the plaintiffs, from what, in the previous dealings, and in this, with the defendants, he had done with the plaintiffs' approbation as their agents; and especially his authority when he came there with the sample of the paper that had been made, and which was then on the dock, ready for delivery, to justify the defendants in acting upon his statement, that he was authorized by the plaintiffs to deliver the goods subject to the condition which he proposed, and upon which alone the defendants consented to receive the paper, and send it to their customer; and, in my opinion, there was sufficient in the evidence to entitle the judge to leave the question to the jury, in the form which he did.

Among the conflicting questions of fact, was a very important one, the statement of one of the plaintiffs—Craft—that if Goodenough had no other work to do, he was to make himself generally useful, especially when it is viewed in connection with the statement of the witness Hefferman, that he saw Goodenough in the plaintiffs' store, more times than he could tell, writing in the plaintiffs' books, talking to customers, sorting samples and doing various other work such as the witness, who was a paper dealer, often did himself when he was a clerk. It was for the jury to determine between the statement of the plaintiff Craft, who was dead, and the

plaintiff Bingham's testimony that Craft was wrong in making this statement, especially when there was uncontradicted testimony in the case that Goodenough was frequently seen in the plaintiffs' store, doing the kind of work that is done by a clerk. As Goodenough swore that he made no such agreement in respect to the delivery of the paper as the defendant Benjamin H. Harris testified to, the credibility of the whole of Goodenough's testimony was a question solely for the jury.

When the person who came to solicit orders for the plaintiffs, and with whom the defendants arranged as to the amount, quality and price of the paper to be manufactured, for which they gave a written order to the plaintiffs, came afterwards to the defendants' store, and said to the defendant Benjamin H. Harris, " Here is a sample of the paper that is down on the dock," the defendant had, I think, a right to assume that he came from the plaintiffs to announce that the paper was on the dock, ready for delivery to the defendants, and to show them a sample of it as manufactured. Goodenough contradicted this. He testified that he brought a sample of the goods as manufactured, which he got out of Craft's office, to the defendants, for the purpose of obtaining another order ; that this was without the plaintiffs' knowledge, and was about three weeks before the paper arrived in New York, and that he took no other samples of the paper afterwards to the defendants ; in which he is contradicted by the defendant Benjamin H. Harris, by the defendants' two book-keepers, Lyons and Conrad, and their salesman Daniels, all of whom were present, four witnesses, who testify to this interview, and several of them, that it was after the arrival of the paper in New York. Harris testified that it was whilst the paper was on the dock ; Conrad, the book-keeper, that he thought the truckman got the papers to get the paper from the cars, the day after Goodenough was there ; and the other book-keeper (Lyons), that Goodenough said to him : " Here is a sample of the paper which is down on the dock ;" upon which he took the sample in to Mr. Harris, who came out, and the interview occurred as testified to by these four wit-

nesses. Harris testified that it took place on the 24th of May, 1879; that he was sure that that was the date; and that it occurred before the paper was sent to Buffalo; that he was positive of that—absolutely certain.

When this case was formerly before the general term, Judge J. F. DALY was of the opinion that the plaintiff was entitled to recover, because the goods had been already delivered to the defendants' cartman, and were on their way to Buffalo, when Goodenough brought the samples to the defendants, and the defendants had the understanding with him, that the acceptance of the goods was to be conditional on the approval of the defendants' customers in Buffalo. If this appeared on the former trial, it is not the case now; for the evidence is distinct and positive that this qualified acceptance took place before the paper was delivered, when it was still on the dock before its shipment to Buffalo.

As respects the fact of this interview, when it occurred, and what took place at it, we must assume that the jury believed the four witnesses for the defendants.

According to their testimony, what occurred was substantially this: that after the paper had arrived, and was on the dock, ready for delivery to the defendants, Goodenough came to the defendants' store, as already detailed, and exhibited to Harris a sample, saying, " This is the kind of paper." That Harris told him it would not do, either in color or quality; that it was not according to sample; that it was an unsized paper, and as it had to be pasted upon, it would not answer the defendants' purpose nor the party's who was to purchase it; and that he, Harris, would not take it; upon which Goodenough remarked that he knew the customer to whom Harris was selling the paper, and knew that it would suit him. Harris replied: " You seem to know more about my customers and what they want, than myself, but anyhow, I will not take it; I would not send it to my customer for what I would make off the paper, for ten times the amount." That Goodenough then tried to persuade Harris to take it, or to try and get his customer to take it; but Harris refused, upon which Goodenough said, "If you will send it to your customer, and

Bingham *v.* Harris.

it does not answer, and they send it back, we will take it back, or as some of these witnesses testified, " Craft & Bingham will take it back." Harris then asked him, as before stated, whether he had authority to do that; and he made the reply already given, " Whatever I do for Craft & Bingham, I have got the authority from them to do." Upon which, Harris said, " Well, upon that condition, I will let the paper go," but that he would have to bear the expense of transportation ; and Goodenough said that that was all right. The paper was then shipped by the defendants' truckman, to the defendants' customer, in Buffalo, who refused it, and sent it back to the defendants, whereby they were put to the expense of its transportation to Buffalo and back, and lost the profit they would have made by the sale of the paper, if it had been of the kind and quality ordered.

Upon this state of facts, the defendants, in my opinion, were entitled to recover, assuming upon the evidence submitted to the jury, that they might, if they believed the defendants' witnesses, and discredited those of the plaintiffs, find that Goodenough had, from what he was allowed by the plaintiffs to do, in and about their business, the general authority of a clerk, in making sales ; and that the defendant Harris had a right to assume that he had the general authority of a clerk, from the previous dealing the defendants had with the plaintiffs through Goodenough's instrumentality ; and the arrangement with him, as to the quantity, quality and price of the paper to be manufactured, the written order for which Harris afterwards took to the deceased plaintiff, Craft, and which Craft accepted and agreed to furnish ; and that when Goodenough came with an announcement to Harris that the paper had . arrived, and showed him a sample of it, Harris had a right to assume that he came from the plaintiffs, to deliver the paper that had been ordered, and that he could, as their agent, especially after what he said, arrange for a conditional delivery of it.

If Goodenough had been simply a broker, who followed the business solely of soliciting sales for the plaintiffs, or whoever employed him, the defendants would perhaps not have

been warranted in assuming that he had any other authority than attaches to such an occupation, but he was in the plaintiffs' store, performing, as it was proved, the general duties of a clerk; and Harris was not only in the habit of making purchases of paper through his instrumentality, but he came to the defendants' store to collect bills for the plaintiffs, sometimes before they were due; and though Harris had only personal knowledge of his doing so in one instance, it was proved by the defendants' clerks that he did so in other instances, a general fact in respect to the defendants' business which Harris necessarily knew from his statement, that they had previously purchased " some numbers of papers " through him, and that he collected the bills, as their receipt-book would show.

Significance is attached by the appellants to the fact that Harris testified that he took the written order personally to the plaintiffs' store and thought it necessary to do so. On this point, what he testified to was this: He said that their course was to make out a written order and take it to the plaintiffs' office. He was asked by the plaintiffs' counsel, with reference to the particular transaction, if he thought it necessary to deal directly with the house, in closing it. He replied that Goodenough had told him that he would be over there, (at the plaintiffs' store) that day, and that his, Harris' customers were complaining, and in reply to a further question; if he thought it necessary to take the order to the house, he answered that he did. This may have been susceptible of the construction that Harris treated Goodenough merely as a broker who came to solicit orders; and that if he gave an order, all further transaction, in respect to it, was had by him with the principals. But it was not the only inference of which it was susceptible, when taken in connection with all that was testified to by the defendants' witnesses. It may have been, notwithstanding that Harris took the written order himself to the principals, that he understood, and had a right to assume from what had previously occurred, that Goodenough was clothed with the general authority of ordinary clerks, in making sales, as he not only solicited orders, but

Bingham *v.* Harris.

was like other clerks, in the plaintiffs' store, and that he collected bills for them, upon sales made by him, when the bills matured. In my opinion, it was for the jury, and not for the court, to judge what inference should be drawn from this piece of evidence ;—the court could not say, as matter of law, that the facts sworn to by the defendants admitted of but one conclusion, that the defendants in this and the other transaction dealt directly with the principals, and showed that they regarded Goodenough solely as a broker who came to them, the same as any other broker might do, to solicit orders for the plaintiffs, and nothing more, leaving them to negotiate and consummate the sales with the plaintiffs, without any further interference or instrumentality on his part. The question therefore in the case, and upon which, in my judgment, the case turns, was a question for the jury, on all the facts, and not for the court.

OAKLEY, Ch. J., in *Clark* v. *The Metropolitan Bank* (3 Duer, 248), observes that in many cases a principal is responsible for the act of his agent, although in abuse or excess of the authority given him, where the question arises between the principal and a third person, who, believing and having a right to believe, that the agent was acting within, and not exceeding or abusing his authority, would sustain a loss if the act were not considered the act of the principal, and where the sole question is by which of two innocent parties a loss, resulting from the fraud or misconduct of an agent, ought to be borne.

In *Pickering* v. *Busk* (15 East, 38), BAYLEY, J., said, "If the servant of a horse-dealer with express directions not to warrant, do warrant, the master is bound, because the servant having a general authority to sell, is in a condition to warrant, and the master has not notified to the world that the general authority is circumscribed." And in the same case, Lord ELLENBOROUGH says, "strangers can only look to the acts of parties and to the external indicia of property, and not to the private communications between a principal and his broker ; and if a person authorize another to assume the apparent right of disposing of property in the ordinary course of trade, it

must be presumed that the apparent authority is the real authority; and that he may bind his principal within the limits of the authority with which he has been apparently clothed by the principal in respect to the subject matter; and that there would be no safety in mercantile transactions if this were not so."

The defendants were entitled to recover as their damages, the amount they had paid for freight, and the profit they would have made by the sale, if the paper had been as ordered; which, with the freight, amounted to $313.98, being the sum for which the jury rendered a verdict for the defendants.

The jury first came in and announced that they had agreed upon a verdict in favor of the defendants for the amount paid by them for freight from Buffalo to New York, and interest; which verdict the judge refused to receive, telling the jury, that if the defendants were entitled to a verdict, they were entitled to a verdict for freight and profits; and that they must reconsider their verdict; to which direction, the plaintiffs excepted; upon which the jury returned a verdict for the defendants, for $313.98.

The judge, in my opinion, was right. If the defendants were entitled to recover at all, they were entitled to recover their damages, which embraced, not only the expense of the transportation of the paper from New York to Buffalo and back, but the amount they would have received on the sale if the paper had been of the quality and kind the plaintiffs had contracted to furnish.

The plaintiffs were not entitled to the instruction asked, that if an agreement was made that the acceptance should be conditional, they were not required to fulfill it, because when the paper was returned to New York and offered to them, it was in a damaged condition, having been subjected to bad usage and improper handling; the evidence being that when the paper was taken to the dock by the defendants' truckman to be shipped to Buffalo, it was, according to his testimony, in the worst condition he had ever seen; the strings were cut; it was not half tied up, and had no wrappers on it; whereas, for carriage, according to the testimony of this witness, who had

been long in the carting business, and knew it thoroughly, the paper ought to have been wrapped up and tied with good strong ropes, not less than six strings to a bundle. He testified that it was in such a condition that he could not carry it on his cart; that he had to take it to the cars in a two-wheeled truck carried by hand; that he had to take it in that way to get it aboard the cars; it was so badly done up, that he told Goodenough after he came back that it was in the worst condition he had ever seen; and that Goodenough said he knew that and laughed. There being no evidence to show that it sustained any greater damage in its transportation from New York to Buffalo and back, than was incident to its carriage in such a condition, the judge could not charge, as matter of law, as he was required to do in the proposition submitted, that the plaintiffs, if they were bound by the conditional acceptance, were not required, when the paper was offered to them upon its return, to receive it, because it was in a damaged condition, and had been submitted to bad usage and improper handling. Nor were the plaintiffs, for the reasons already stated, entitled to the direction, that the delivery of the paper by the plaintiffs was absolute and unconditional.

The exceptions taken at the close of the judge's charge are answered by the reasons already given. Nor was the instruction in respect to Harris' testimony, upon the question of color, at the close of the charge, material. The objection to the paper was not on the ground of the color alone, but mainly on account of the quality; not having been sized, which was required by the sample, as the paper had to be pasted upon. This was the test, the defendant Harris having called the salesman to ask his opinion, and he, after wetting the paper with his tongue, declared it to be unfit for the purpose for which it was to be sold to the defendants' customer.

None of the exceptions to the admission or exclusion of testimony were well taken.

The first was as to the interview with Goodenough, which was clearly admissible, as it was the interview in which he came to solicit the sale. What took place when Goodenough came

Bingham *v.* Harris.

afterwards to the defendants to announce that the paper had arrived, and to exhibit a sample of it, was admissible, for reasons already given.

As respects the exception, to strike out what transpired between the Buffalo and the New York houses, because it was in writing, the objection was removed by the defendants' offer to produce the correspondence ; and as nothing further transpired, it is to be assumed that the plaintiffs were satisfied, and did not require the production of the written evidence in place of the oral testimony ; which may very well have been, as the inquiry, in respect to what transpired between the defendants and their customer in Buffalo, was called out by a question put by a juror.

The question objected to, on the examination of Hefferman, as immaterial and irrelevant—what he saw Goodenough doing in the plaintiffs' store, having seen him there many times—was competent to show what Goodenough was allowed to do in and about the business with the plaintiffs' knowledge and authority.

The same remark applies to the question put by the juror to the plaintiff Bingham, whether Goodenough did any other work in their store, or out of it, than soliciting orders.

The question whether there is a general custom in the paper trade of New York city, to employ brokers, and the extent of their authority, was properly excluded.

The objection immediately following this, is not insisted upon in the points ; and I therefore assume, has been abandoned.

The judgment should be affirmed.

J. F. DALY and BEACH, JJ., concurred.

Judgment affirmed.